## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

  v.           Case No. 19-03048-03-CR-S-BCW

JEREMY YOUNG HUTCHINSON,

     Defendant.

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri, represented by United States Attorney Timothy A. Garrison and Assistant United States Attorney Steven M. Mohlhenrich, and the Public Integrity Section of the U.S. Department of Justice, Criminal Division, represented by Acting Chief AnnaLou Tirol and Trial Attorney Marco A. Palmieri (otherwise referred to as "the Government" or "the United States"), and the defendant, Jeremy Young Hutchinson ("the defendant"), represented by Nathan J. Muyskens, Esq., and Timothy Dudley, Esq.  The defendant understands and agrees that this plea agreement does not bind any other federal, state or local prosecution authority or any other government agency, unless otherwise specified in this agreement or any addendum thereto.

2. **Defendant's Guilty Plea**.  The defendant agrees to and hereby does plead guilty to Count 1 of the First Superseding Indictment ("the Indictment"), charging him with a violation of **Title 18, United States Code, Section 371**, that is, **Conspiracy**.  The defendant also agrees to forfeit to the United States the property described in the Forfeiture Allegation of the Indictment.

By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is, in fact, guilty of this offense.

3. **Settlement of Charges in Other Districts.** This plea agreement is part of a "global" settlement of criminal investigations and prosecutions of the defendant in three districts: the Western District of Missouri, the Western District of Arkansas, and the Eastern District of Arkansas. While the charging and plea documents in each district set forth the details of the defendant's pleas in those districts, the essential terms of the agreement include this plea agreement, any supplement or addendum to this plea agreement that may exist, and the following:

    a.    In *United States v. Bontiea Bernedette Goss, et al.*, Western District of Missouri case number 19-03048-01/03-CR-S-BCW, defendant Hutchinson will plead guilty to Count 1 of the First Superseding Indictment, charging him with a violation of Title 18, United States Code, Section 371, that is, conspiracy, and will admit the Forfeiture Allegation of the First Superseding Indictment.

    b.    In the Western District of Arkansas, defendant Hutchinson will waive indictment and consent to the filing of a felony information charging one count of conspiracy to commit federal funds bribery, in violation of Title 18, United States Code, Sections 371 and 666(a)(1)(B).

    c.    In *United States v. Jeremy Young Hutchinson*, Eastern District of Arkansas case number 4:18-CR-00450-KGB, defendant Hutchinson will plead guilty to Count 9 of the indictment, that is, to one count of willfully making and subscribing to a false income tax return, in violation of Title 26, United States Code, Section 7206(1).

    d.    The United States Attorneys for the Eastern District of Arkansas and Western District of Arkansas have agreed to approve defendant Hutchinson's request for the transfer of his Western District of Arkansas Case to the Eastern District of Arkansas for his guilty plea and sentencing, pursuant to Rule 20 of the Federal Rules of Criminal Procedure.

    e.    While the plea agreements in each district may contain stipulations regarding United States Sentencing Guidelines calculations, the parties retain the right to argue for any lawful sentence, including an upward or downward departure or variance from the Sentencing Guidelines.

f.     Based upon evidence in their possession at this time, as a part of the plea agreements, Western District of Missouri, Eastern District of Arkansas, Western District of Arkansas, and the Public Integrity Section of the U.S. Department of Justice, Criminal Division, agree to bring no further charges related the defendant's known criminal conduct for which they have venue, and at sentencing will dismiss as to this defendant the counts of the relevant indictments to which the defendant has not pleaded guilty.

4.     **Factual Basis for Guilty Plea.**  The parties agree that the facts constituting the offense to which the defendant is pleading guilty are as follows:

### A.     Persons and Entities

Defendant JEREMY YOUNG HUTCHINSON ("HUTCHINSON") served as a Senator in the Arkansas Senate from 2011 to 2018.   HUTCHINSON was also an attorney during all times material to this Plea Agreement.

Preferred Family Healthcare, Inc. ("PFH") was a Missouri nonprofit corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri.  PFH and its subsidiaries provided a variety of services to individuals in Missouri and Arkansas, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services.  Originally, and for most of its existence, PFH was known as Alternative Opportunities, Inc. ("AO"), a Missouri nonprofit corporation formed on December 3, 1991.  Effective May 1, 2015, AO merged with Preferred Family Healthcare, Inc., of Kirksville, Missouri, with the merged entity retaining the PFH name and corporate charter.  (Hereinafter, "the Charity" shall refer to the entity known as Preferred Family Healthcare, Inc., after April 30, 2015, and Alternative Opportunities, Inc., prior to May 1, 2015.)

Bontiea Bernedette Goss ("B. Goss") was the Charity's Chief Operating Officer, and served as the chief administrator over personnel in all programs and services.

Tommy Ray Goss, also known as Tom Goss ("T. Goss") was the Charity's Chief Financial Officer.

Milton Russell Cranford, also known as "Rusty" Cranford ("Cranford"), was a lobbyist registered with the Arkansas Secretary of State.  Cranford served as a high ranking executive with the Charity helping to oversee the Charity's operations in the state of Arkansas.

3

Robin Raveendran ("Raveendran") worked for the Charity from 2014 until 2017. During his employment with the Charity, Raveendran held the titles of Executive Vice President, Director of Operations, and Analyst. Prior to his employment with the Charity, Raveendran was employed by the state of Arkansas as Director of Program Integrity for the Arkansas Department of Human Services, Division of Medical Services, and then as Business Operations Manager with the Office of the Medicaid Inspector General.

Alliance for Health Improvement, also known as Alliance for Health Care, also known as Alliance for Health Care Improvement ("Alliance") was a private association formed in early 2014 by Raveendran, Cranford, and HUTCHINSON, to advocate for issues relevant to health care providers at the Arkansas state legislature and in state departments. In 2014, 2015, and 2016, the Charity made $25,000 annual dues payments to Alliance even when other providers only paid annual membership dues of $5,000 and $10,000. HUTCHINSON, Cranford, and Raveendran received income directly from the membership dues paid by these providers. On or about December 29, 2017, Raveendran registered Alliance for Health Improvement as a nonprofit corporation with the Arkansas Secretary of State.

The Arkansas House consisted of 100 members ("Representatives" or "legislators"), each elected from a specific electoral district from across the state. The Arkansas Senate consisted of 35 members ("Senators" or "legislators") each representing a specific electoral district.

An Arkansas Representative's or Senator's duties included, but were not limited to: (a) investigating, studying, reporting, making recommendations, and amending or substituting measures or matters related to the jurisdiction of the House or Senate, or the Representative's or Senator's Committee; (b) scheduling and holding public hearings and meetings, summoning witnesses, and hearing testimony related to measures or matters within the jurisdiction of the House or Senate, or the Representative's or Senator's Committee; (c) drafting, filing, and voting on bills of law, resolutions, and substitute measures; and (d) appraising, approving, and overseeing budgets and the appropriation of state monies, including funds from the state of Arkansas' General Improvement Fund ("GIF").

Article 19, Section 20 of the Arkansas Constitution required that all Arkansas "Senators and Representatives, and all judicial and executive, State and county officers, and all other officers, both civil and military, before entering on the duties of their respective offices, shall take and subscribe to the following oath of office: 'I, _____, do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of Arkansas, and that I will faithfully discharge the duties of the office of _____, upon which I

4

am now about to enter.'"  Arkansas House Representatives and Senators owe a fiduciary duty to provide honest services to the state of Arkansas and its citizens.

The Arkansas Department of Human Services ("ADHS") was an agency of the state of Arkansas that provided various services to individuals in the state of Arkansas to include behavioral health services, which were provided through the Division of Behavioral Health Services ("DBHS").  Among the services it provided, DBHS administered a system of public mental health care and drug prevention and treatment throughout Arkansas.  These services were provided through community mental health centers and specialty clinics which were established to provide points of entry into the public mental health system across the state of Arkansas.

Between 2012 and 2015, ADHS attempted to implement different healthcare initiatives in an attempt to increase accountability on healthcare providers and to lower healthcare costs, while maintaining quality healthcare for Arkansas citizens.  Some of ADHS's initiatives included, but were not limited to, the following:

- The Color Scorecard or "Scorecard" ADHS initiative was designed to grade healthcare providers on the effectiveness of services that were being provided.

- The Youth Outcomes Questionnaire ("YOQ") was a questionnaire that was designed to be given to child patients and their families in an effort to measure the effectiveness of healthcare services being provided.  Under ADHS's initiative, the results received from the YOQs by healthcare providers, like the Charity, would be a factor in decisions by ADHS on whether to renew Arkansas State contracts with healthcare providers.  "Company G" was a rating company contracted by the state of Arkansas that was hired to administer the YOQ and "Scorecard" initiatives.

- Episodes of Care was a healthcare system designed to define specific treatment plans for particular clinical conditions or procedures based on best practices within the healthcare industry while still allowing physicians to treat the specific needs of patients.  By encouraging providers to use the Episodes of Care system, ADHS sought to minimize excessive healthcare costs while still maintaining quality healthcare.

- Health Homes was a healthcare system designed to consolidate and coordinate mental and behavioral healthcare treatment, for applicable patients, into a single provider.

5

During each of the calendar years 2012 through 2017, Arkansas received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.

## B. The Government's Proof

HUTCHINSON acknowledges and agrees that the United States could prove the following facts and allegations at trial by competent evidence, establishing beyond a reasonable doubt that he is guilty of Count 1 of the Indictment:

### (1) Object

From 2012 until 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, HUTCHINSON, B. Goss, T. Goss, Cranford, and Raveendran, knowingly and unlawfully conspired, confederated, and agreed together, and with each other, to corruptly give, offer, and agree to give, and for HUTCHINSON to corruptly solicit, demand, and accept, anything of value to any person, intending to influence and reward HUTCHINSON in connection with a business, transaction, and series of transactions of the state of Arkansas involving $5,000 or more, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

### (2) Manner and Means

The manner and means by which the conspirators achieved and attempted to achieve the objects of the conspiracy included:

- B. Goss, T. Goss, and Cranford caused the Charity to provide public officials, including HUTCHINSON, with travel and entertainment not reported on its IRS Forms 990, including hotel accommodations and use of the Charity's luxury and recreational real estate.

- B. Goss and Cranford caused the Charity to hire HUTCHINSON and pay him a monthly retainer, in exchange for HUTCHINSON agreeing to take, and taking, legislative and official action favorable to the Charity, B. Goss, T. Goss, and Cranford.

- B. Goss, Cranford and Raveendran caused the Charity to pay Charity funds to Alliance, and then directed Alliance funds to HUTCHINSON, in exchange for HUTCHINSON agreeing to take, and taking, legislative and official action favorable to the Charity, B. Goss, T. Goss, Cranford, and others.

6

- In exchange for the things of value provided by B. Goss, T. Goss, Cranford, Raveendran, and the Charity, HUTCHINSON agreed to take, and did take, favorable legislative and official action on behalf of the Charity, B. Goss, T. Goss, Cranford and others, including but not limited to: holding up agency budgets; initiating legislative audits; sponsoring, filing, and voting for legislation, including shell bills; and pressuring and advising other public officials to perform official action on behalf of the Charity, B. Goss, T. Goss, Cranford, and others.

- B. Goss, T. Goss, Cranford, Raveendran, and HUTCHINSON concealed, covered up, and falsified evidence of their theft, embezzlement, and intentional misapplication of the Charity's funds, and their payment and acceptance of bribes by falsely describing such unlawful payments as being solely for attorney's fees and legal retainers.

### (3) Overt Acts

In furtherance of the conspiracy, and to accomplish its objects, HUTCHINSON, B. Goss, T. Goss, Cranford, and Raveendran, committed the following overt acts, among others, in the Western District of Missouri and elsewhere:

*B. Goss, T. Goss, and Cranford Offered and Gave Things of Value to HUTCHINSON*

- From 2012 to 2017, B. Goss and Cranford offered and gave, directly and indirectly, cash; checks; wire transfers; retainers; attorney's fees; and professional referrals to HUTCHINSON in exchange for HUTCHINSON taking legislative and official action favorable to the Charity, Cranford, Cranford Clients, and others, including but not limited to, holding up agency budgets; requesting legislative audits; sponsoring, filing, amending, and voting on legislation; and supporting the award of GIF funds to the Charity, Cranford clients, and others.

- On March 19, 2013, T. Goss e-mailed Cranford, stating, in part, "Rusty I have the tickets and hotel for the Senator." The e-mail referred to HUTCHINSON.

- Between in or about January 2013 and in or about March 2013, Cranford assisted and facilitated the hiring of HUTCHINSON by the Charity, by in or about February 2013, arranging for a meeting between B. Goss and HUTCHINSON to discuss his hiring by the Charity.

7

- In or about March 2013, Cranford met with B. Goss and discussed the potential hiring of HUTCHINSON by the Charity. Cranford and B. Goss specifically discussed hiring HUTCHINSON, in part, because of his status as an Arkansas Senator and because of the favorable legislative and official acts HUTCHINSON could perform on behalf of the Charity.

- In or about April 2013, as a benefit to HUTCHINSON, B. Goss caused the Charity to hire HUTCHINSON, purportedly to provide legal services, at the rate of $7,500 a month. In or about May 2014, and until in or about 2017, B. Goss caused the Charity to pay HUTCHINSON $9,000 per month. In total, HUTCHINSON was paid more than $350,000 in Charity funds.

- In or about 2013, T. Goss and Cranford offered and facilitated the giving of Charity-paid-for hotel rooms for the purpose of attending Major League Baseball games to HUTCHINSON, which he accepted.

- In or about 2015, "Accounting Firm A" conducted its annual audit of the Charity. In response to questions from Accounting Firm A, "Employee F" e-mailed T. Goss on October 21, 2015, the following:

  > Auditors want to send a legal letter to Jeremy Hutchinson to confirm no pending or threatening litigation with PFH that could be potential liability. This is standard practice for the auditors and we send them to multiple law firm[s]. They are looking for a contact email for Jeremy for him to prepare the letter; however his phones are disconnected? Do you all have an email address for him they can send the confirmation to?

  To conceal the conspiracy and fraudulent scheme, and specifically that HUTCHINSON was being paid, in part, in exchange for taking favorable legislative and official action, T. Goss responded on the same day, October 21, 2015: "[Cranford] will. [HUTCHINSON] doesn't work for us in a legal capacity though. He is a consultant. There is no need for the letter since he doesn't provide legal services."

- To conceal the unlawful nature of the payments to HUTCHINSON, on July 5, 2016, HUTCHINSON and B. Goss executed an engagement letter between HUTCHINSON and the Charity, which states HUTCHINSON could not locate the original contract between HUTCHINSON and the Charity, which was false in that the post hoc engagement letter was created to make the payments to Hutchinson appear to be solely for attorney's services. The same day, B. Goss sent an e-mail to attorneys retained by the Charity in relation to the investigation by federal law enforcement officials, and stated, amongst other things, that the original engagement letter

8

between the Charity and HUTCHINSON could not be located and attached the July 5, 2016, engagement letter.

*Cranford and Raveendran Paid Charity Funds to HUTCHINSON through Alliance*

- Though no corporate entity by the name of ALLIANCE FOR HEALTHCARE IMPROVEMENT was incorporated by Raveendran at the time, on or about April 2, 2014, Raveendran opened an account in the name "ALLIANCE HEALTH CARE IMPR" at Arkansas Employees Federal Credit Union in Little Rock, Arkansas ("the Alliance account"), as the sole signatory, and deposited check #042742 from the Charity for $25,000 into that account.

- On or about April 16, 2015, check #055272, drawn on the Charity's MNB account ending 8747, in the amount of $25,000, was issued to "ALLIANCE FOR HEALTH IMPROVEM[E]NT." On or about April 17, 2015, Raveendran deposited this check into the Alliance account.

- On or about April 17, 2015, Raveendran issued check #1014, dated April 18, 2015, in the amount of $8,125, drawn on the Alliance account, to HUTCHINSON. On or about the same day, HUTCHINSON deposited the check into his Arvest Bank account ending 7635.

- On or about January 27, 2016, check #67259, in the amount of $25,000, was issued to "ALLIANCE FOR HEALTH IMPROVEM[E]NT" from the Charity's account at OakStar Bank ending in 3560.

- On or about December 29, 2017, Raveendran registered Alliance for Health Improvement with the Arkansas Secretary of State as a nonprofit corporation.

*In Exchange for monetary payments to him and other things of value, HUTCHINSON Agreed to Take, and Did Take, Favorable Legislative and Official Action on Behalf of Raveendran, the Charity, B. Goss, T. Goss, Cranford, and Others*

*SB 932 and HB 1540*

- On or about March 4, 2015, Raveendran sent an e-mail from his Alliance e-mail account to HUTCHINSON and Cranford stating:

9

Hi Jeremy

We need to file a shell bill to take care of this issue, it may be possible we should be able to work this out with Workforce, however, ju[s]t to protect us we want to a shell bill.

Let me know if you need additional information.

Thanks

The body of the e-mail contained a summary analysis of the issues surrounding the legal definition of an "independent contractor" and "employee" in Arkansas. It also suggested a specific revision to Arkansas Code Annotated § 11-10-210(e) to remedy the issues in a manner favorable to healthcare providers.

- On or about March 7, 2015, HUTCHINSON filed Senate Bill 932 ("SB 932") in the 90th General Assembly Regular Session in 2015. The bill was a shell bill entitled "An Act to Amend the Law Concerning the Definition of 'Independent Contractor'; and for Other Purposes."

- House Bill 1540 ("HB 1540"), filed later in March 2015, contained statutory language advantageous to the providers, like the Charity and other members of Alliance, similar to that proposed by Raveendran in his March 4, 2015, e-mail to HUTCHINSON. On or about March 26, 2015, HUTCHINSON voted in favor of HB 1540.

*Other Legislative and Official Acts*

- Between in or about 2014 and in or about 2015, the Arkansas Department of Human Services ("ADHS") attempted to implement different healthcare initiatives including, but not limited to, the Episodes of Care (collectively, the "ADHS Initiatives"). B. Goss, T. Goss, Cranford, Raveendran and others believed ADHS Initiatives, like the Episodes of Care, would negatively impact the Charity and others by increasing costs to the Charity and by limiting the amount of revenue the Charity and others would be able to make.

- Between in or about 2014 and in or about 2015, because HUTCHINSON was being paid money from Alliance and the Charity, through Alliance, HUTCHINSON, through Raveendran's direction, agreed to: (1) promote the Charity's, Alliance's, and others' position on the ADHS Initiatives, including the Episodes of Care, in the Arkansas legislature, including, but

10

not limited to, in committees, task force meetings, or with other legislators to the extent he was able; and (2) advise, pressure, and persuade other Arkansas legislators to support the Charity's, Alliance's, and others' position on the ADHS Initiatives, including the Episodes of Care, including persuading the Arkansas House and Senate leadership to review proposals by the Alliance and to support them through legislative and official action.

### C.  Defendant's Plea to Count 1

HUTCHINSON admits and acknowledges that from 2012 until 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, he, B. Goss, T. Goss, Cranford, and Raveendran, knowingly and unlawfully conspired, confederated, and agreed together, and with each other, to corruptly give, offer, and agree to give, and for HUTCHINSON to corruptly solicit, demand, and accept, anything of value to any person, intending to influence and reward HUTCHINSON in connection with a business, transaction, and series of transactions of the state of Arkansas involving $5,000 or more, in violation of Title 18, United States Code, Sections 371, 666(a)(1)(B), and 666(a)(2).

HUTCHINSON specifically acknowledges that he understood B. Goss hired him as outside counsel for the Charity primarily because of his position as an elected public official, that B. Goss, Cranford, and Raveendran repeatedly asked him to move the Charity's agenda forward in the Arkansas Senate, and that as part of his arrangement with the Charity, HUTCHINSON, at the direction of B. Goss, Cranford, and Raveendran, pushed the Charity's agenda forward via official acts such as holding up agency budgets and drafting and voting on legislation, including amendments.

HUTCHINSON further admits and acknowledges that to legitimize and conceal this arrangement, he performed legal work for the Charity during the time of this financial arrangement.  While some of this legal work was in fact completed, HUTCHINSON would have never been hired as the Charity's counsel had it not been for his official position.  HUTCHINSON further admits and acknowledges that the July 5, 2016 "engagement letter" he and B. Goss executed was intended to conceal the unlawful nature of the payments to HUTCHINSON by making the payments to Hutchinson appear to be solely for attorney's services, when in truth and in fact a significant purpose of the payments was to influence and reward HUTCHINSON for his official actions benefitting the Charity.

### D.  Defendant's Admission of the Forfeiture Allegation

From 2012 until 2017, HUTCHINSON received funds and other things of value from the Charity, B. Goss, T. Goss, Cranford, Raveendran, and the Alliance, in order influence and reward him in connection with a business, transaction, and

series of transactions of the state of Arkansas. HUTCHINSON agrees to the entry of a forfeiture money judgement against him in an amount to be determined in connection with the sentencing of this matter, which amount the parties reserve the right to litigate.

5. **Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charge to which he is pleading guilty.

6. **Statutory Penalties.** The defendant understands that, upon his plea of guilty to Count 1 of the Indictment, charging him with violation of **18 U.S.C. § 371**, that is, **Conspiracy**, the maximum penalties the Court may impose are 5 years' imprisonment, 3 years' supervised release, a fine of $250,000 (or twice the amount of the gross gain or gross loss, whichever is greater), an order of restitution, and a $100 mandatory special assessment, which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class D felony.

7. **Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable."

b.      The Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing.

c.      In addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years; the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed.

d.      If the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release.

e.      The Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range.

f.      Any sentence of imprisonment imposed by the Court will not allow for parole.

g.      The Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office.

h.      The defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

i.      The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings.

j.      The defendant agrees to forfeit all interests he owns or over which he exercises control, directly or indirectly, in any asset that is subject to forfeiture to the United States either directly or as a substitute for property that was subject to forfeiture but is no longer available for the reasons set forth in 21 U.S.C. § 853(p) (which is applicable to this action pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). With respect to any asset which the defendant has agreed to forfeit, the defendant waives any constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that

the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the United States Constitution.

k.     The defendant agrees to fully and truthfully disclose the existence, nature and location of all assets forfeitable to the United States, either directly or as a substitute asset, in which he and his co-conspirators have or had any direct or indirect financial interest, or exercise or exercised control, directly or indirectly, during the period from **2012** to the present.  The defendant also agrees to fully and completely assist the United States in the recovery and forfeiture of all such forfeitable assets.

l.     The defendant agrees to take all necessary steps to comply with the forfeiture matters set forth herein before his sentencing.

m.     Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit:  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office.  The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

8.     **Government's Agreements.**  Based upon evidence in its possession at this time, the United States, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the crimes charged in the Indictment for which it has venue and which arose out of the defendant's conduct described above.  Additionally, the United States Attorney for the Western District of Missouri agrees to dismiss as to HUTCHINSON only, Counts 2 through 4, 8, 13 through 17, 19, and 20 of the First Superseding Indictment, and the original Indictment in its entirety, at sentencing.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the Person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States has no knowledge.

14

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that, if the United States elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

9. **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

10.     **Withdrawal of Plea.**  Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court.  In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible.  However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal.  The defendant understands that, if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

11.     **Agreed Guidelines Applications.**  With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

     a.      The Sentencing Guidelines do not bind the Court and are advisory in nature.  The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

     b.      The applicable Guidelines section is U.S.S.G. § 2C1.1(a)(1), which provides for a **base offense level of 14.**

     c.      Pursuant to U.S.S.G. § 2C1.1(b)(1), a **2-level enhancement** applies, because the offense involved more than one bribe.

     d.      Pursuant to U.S.S.G. § 2C1.1(b)(2), and U.S.S.G. § 2B1.1(b)(1), an enhancement will apply.  **Both the United States and the defendant reserve the right to advocate their respective positions regarding the amount of the enhancement.**

     e.      Pursuant to U.S.S.G. § 2C1.1(b)(3), a **4-level enhancement** applies, because the offense involved an elected public official.

16

f.     The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently.     Therefore, he is entitled to **a three-level reduction** pursuant to § 3E1.1(b) of the Sentencing Guidelines.     The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement, any supplement thereto, and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility.

g.     The defendant appears to have a **criminal history category of I**.  The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office.

h.     The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels.  Additionally, the failure of the Court to accept these stipulations will not, as outlined in paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty.

i.     The defendant understands that the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable." **Both the United States and the defendant reserve the right to argue for any lawful sentence, including a sentence outside the Guidelines range.**

j.     The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum.  The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the Indictment.  The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

k.     The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will

17

make during his plea colloquy, support the imposition of the agreed upon Guidelines calculations contained in this agreement.

12. **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

13. **Change in Guidelines Prior to Sentencing.** The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

14. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

      a.    oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

      b.    comment on the evidence supporting the charges in the Indictment;

      c.    oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

      d.    oppose any post-conviction motions for reduction of sentence, or other relief.

Case 6:19-cr-03048-BCW   Document 58   Filed 07/08/19   Page 18 of 25

15. **Waiver of Constitutional Rights.**    The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

        a.      the right to plead not guilty and to persist in a plea of not guilty;

        b.      the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

        c.      the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

        d.      the right to confront and cross-examine the witnesses who testify against him;

        e.      the right to compel or subpoena witnesses to appear on his behalf; and

        f.      the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial.  The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offense to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement.  The defendant also understands that he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

16. **Waiver of Appellate and Post-Conviction Rights.**

a. The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) a sentence imposed in excess of the statutory maximum. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

17. **Waiver of Venue.** The defendant waives any challenge to venue in the Western District of Missouri.

18. **Discovery Waiver.** The defendant waives the right to any further discovery or disclosures of information not already provided at the time of the entry of the guilty plea, other than information required to be disclosed under Federal Rule of Criminal Procedure 32(i)(2) and exculpatory or impeachment information casting doubt upon sentencing factors.

19. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

a. The Court may order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the indictment which are to be dismissed and all other uncharged, related criminal activity.

b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

20

c.     The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

d.     Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit: (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

e.     At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

f.     The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

g.     The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of **$100** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

h.     The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

i.     In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture,

Case 6:19-cr-03048-BCW   Document 58   Filed 07/08/19   Page 21 of 25

restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered plea of guilty shall remain in effect and cannot be withdrawn.

20. **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

21. **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

22. **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The

defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

23. **Defendant's Representations.**  The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.  The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement.  The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his plea of guilty.

24. **No Undisclosed Terms.**  The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

25. **Standard of Interpretation.**  The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any

Case 6:19-cr-03048-BCW   Document 58   Filed 07/08/19   Page 23 of 25

drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

TIMOTHY A. GARRISON
United States Attorney, Western District of Missouri

Dated: _6/25/2019_          By: _/s/ Steven M. Mohlhenrich_
STEVEN M. MOHLHENRICH
Assistant United States Attorney


ANNALOU TIROL
Acting Chief, Public Integrity Section

Dated: _6/25/2019_          By: _/s/ Marco A. Palmieri_
MARCO A. PALMIERI
Trial Attorney

24

I have consulted with my attorneys and fully understand all of my rights with respect to the offense charged in the Indictment. Further, I have consulted with my attorneys and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorneys. I understand this plea agreement and I voluntarily agree to it.


Dated: _6/25/2019_        _/s/ Jeremy Young Hutchinson_
                                           JEREMY YOUNG HUTCHINSON
                                           Defendant


We are defendant Jeremy Young Hutchinson's attorneys. We have fully explained to him his rights with respect to the offense charged in the Indictment. Further, we have reviewed with him the provisions of the Sentencing Guidelines that might apply in this case. We have carefully reviewed every part of this plea agreement with him. To our knowledge, Jeremy Young Hutchinson's decision to enter into this plea agreement is an informed and voluntary one.


Dated: _____        _____
                                           NATHAN J. MUYSKENS
                                           Attorney for Defendant


Dated: _6/25/2019_        _/s/ Timothy Dudley_
                                           TIMOTHY DUDLEY
                                           Attorney for Defendant